and we will be proceeding first with the motion in Trump v. Vance. What we will do for each case is that we will allow for two minutes of uninterrupted argument for each side and then in series the judges will ask questions with Judge Walker being the first questioner of each side in the Trump v. Vance motion. You may proceed, Counselor. Thank you, Your Honor, and good morning and may it be a pleasure to be here today. I would like to begin with a brief summary of the case. The Supreme Court remanded this case so that the President may raise appropriate additional claims. The President did so in arguing, one, that this subpoena is an arbitrary fishing expedition and, two, that it was issued in bad faith in the Supreme Court. These are serious claims. Indeed, it took the District Court over a hundred pages to reject them at the pleading stage. The question then at this juncture is quite simple but also quite important. Will the President be given an opportunity to appeal that ruling before his personal records are disclosed to the grand jury and the status quo? The Supreme Court improperly imposed a probability requirement at the pleading stage in contravention of long-settled Second Circuit law. The President will be irreparably injured if those records are disclosed and potentially even have his case mooted and the balance of harms weighs strongly in favor of a stay given that the District Attorney has already agreed to delay enforcement for over a year. So we respectfully request that a stay pending appeal be granted. But in the event that the Court disagrees with the President's submission, we further respectfully request that the Court grant an administrative stay so that the President may have time to seek further review from the Supreme Court on this issue. Thank you, Your Honor. And with that, I will happily answer any questions that the Court might have. Mr. Consovoy, this is Judge Walker. First of all, I take it that a denial of a stay and an enforcement of the subpoena would effectively moot the appeal. Is that accurate? Is that an accurate portrayal of this? I would say mostly yes, Your Honor. That was our initial submission and we still think that's likely the case. There would need to be The District Attorney now says that partial relief may be available through remedies on the other side, such as returning the documents and things like that. We think in a case like this, when the main relief sought by the President is keeping the records from being disclosed, that relief is not meaningful. But even if the Court were to disagree, I don't think there can be any dispute that the harm is irreparable. Even the District Attorney's own cases say the status quo can never be restored. Well, the other question I have is what the Court of Appeals, the panel that actually hears the appeal, will have to decide and whether or not it's just sort of pro forma and not involving any serious issues or whether there are substantial issues for the Court of Appeals to decide on the merits. And one question I have, and it's just in that context that I want to ask this question. It seems to me that what happened was that the Supreme Court, despite its ruling that the subpoena could pass muster on the questions of immunity and a special need, nevertheless said that when it goes back, there are various standards that may come into play. And that is the heightened respect that's due the President and also the necessarily meticulous review in the case of the President. And the question I have is wouldn't the Court of Appeals have to kind of give definition to those concepts on appeal? Thank you, Your Honor. I think the answer is eventually yes, but I don't think so right now. And I think that's a function of the way the District Attorney decided to handle the case on remand, and I'll explain. So the President filed an amended complaint. I think there can be no dispute that these are intensely factual issues, as Your Honor pointed out and as Judge Kavanaugh elaborated on in his concurring opinion. Had the District Attorney filed an answer and had this proceeded to what it ought to have proceeded to, which is some form of limited discovery and some meticulous review by the District Court and then on appeal, those issues would have been presented immediately on appeal now. What happened, though, was the District Attorney moved to dismiss at the pleading stage and sought to dismiss in the case is simply whether the President's claims are plausible. And I think they clearly are for the reasons we've stated and in line with Second Circuit precedent. I candidly don't think it's a close case. And so we're sort of stuck at an antecedent stage that I think was mostly unnecessary and is, in fact, contributing to further delay. I see. Okay. Thank you. Judge Consovoy, I mean, Judge Katzman, Mr. Consovoy, could you say some more about why, from your perspective, an injunction isn't the appropriate relief here rather than a stay pending appeal? I mean, if even if we were to stay, the District Court's dismissal of the Second Amendment complaint, as I understand it, there is currently no injunction or TRO in place. So isn't the case that the only thing that's stopping the subpoena from going into effect is the District Attorney's voluntary forbearance? Thank you, Your Honor. Yes. So we do think it's a stay. And we think the key reason why is that voluntary decision to not to forbear is now embodied in an order of the District Court with that agreement. So that agreement now is binding on the District Attorney. And what he did was tie his ability to that decision. If the court reverses and renders the District Court's ruling non-final again, there can be no enforcement. And this is exactly what happened in the congressional cases, as we noted in our reply brief. The House, the committees, tied their decision to forbear to the issuance of the mandate, a different judicial order, to be sure, but one nonetheless. And we then sought a stay of the mandate, not an injunction pending appeal from the Supreme Court. No one argued that it wasn't appropriately a stay. And it was granted. Moreover, Your Honor, I would add that in the case you heard in the previous round, an administrative stay was granted. And in objecting to a further stay, the District Attorney never argued that it was an injunction, even though we were in quite the same posture. So I do think it's a stay. But I would only add, finally, I don't think it's an issue really that matters much at this stage. As I read this court's precedent, the standards are the same. And in fact, the District Attorney relied on the same case in challenging our right to an injunction that we relied on in seeking a stay. So I don't think it may matter if further review is required, but I don't think it matters at this point. Just one other question. Thank you. And that goes to the irreparable harm element. And unlawful grand jury disclosure is a felony under New York law. But you also note that there are exceptions to this rule, such as penal law section 215.70. If the court were to deny your request, but also would there be some way, though, to fashion an appropriate remedy to prevent public disclosure pending appeal? And if so, would there still be any irreparable harm? Thank you, Your Honor. So if I could answer the last part first. The answer on irreparable harm is yes. I think there is a dispute there as to whether the appeal would be moot, as I was discussing with Judge Walker. But I don't think there can be a dispute that it would still be irreparable. The cases the District Attorney relies on, including the Scientology case that the Third Circuit cites in his case that he principally relies on to this point, the Supreme Court said the status quo is irrevocably altered once the documents are disclosed, even to the District Attorney. Because quite obviously, you can't make them forget what they learned. You can't unring that bell, as the Fourth Circuit put it. Now, is it possible the court could fashion some remedy that would keep the case from going moot? It's possible. I think it's very difficult because, Your Honor, not only would you have to fashion a relief that keeps the documents confidential, but once they're in the District Attorney's hand and I'm not suggesting at all that anyone would violate grand jury secrecy, not in the slightest. What I am saying is that there are exceptions, and we would have to deal with those. But moreover, there could be third-party requests for these documents, just like Mazars received them. And we would be in a new round of problems at that point. And I think it's fair to say there are innumerable people who might want to make such requests. And so, is it possible that the court could keep the case from being mooted? I can't say it's not, but I think it's quite speculative. And it would still not prevent the meaningful harm, which is the disclosure, and would not keep the harm from being irreparable. Thank you. Judge Loyer? Mr. Consovoy, thank you, Judge Katzmann. Mr. Consovoy, I've got a question that goes a little bit to the nerds just so that I can understand what happened here. So, in the ordinary course, I think it's right, but you can correct me if I'm wrong, that the procedure is to file a motion to quash, not a motion to dismiss where the plausibility standard to which you alluded comes into play. And there is a concern. One of my concerns might be that if this is the ordinary procedure with respect to grand jury subpoenas, prosecutors, both at the local and the federal level, it seems to me, would be mired in the sort of civil litigation that is in play here. What do you say to that? How does that affect our analysis of the merits? Thank you, Your Honor. So, I do not think this is the ordinary situation. And I do not think that federal and state prosecutors in the main should be worried about 1983 actions being the new norm on their cases. What makes this case special? There are two reasons that make this case, I think, different. One, the president was allowed to bring a 1983 action in federal court because of his unique status and the nature of this dispute. That ruling was, that decision was affirmed in Judge Katzmann's opinion, not disturbed by the Supreme Court, and not challenging the motion to dismiss. So, we're already in an unusual place when you have a challenge to a state grand jury subpoena appropriately being in federal court. And I don't think there's a live dispute about whether it's appropriately in federal court. Therefore, that raises the second issue, which is to get into federal court, the president needed to file a civil action, not a criminal motion. Had it been a federal criminal subpoena, I completely agree, Your Honor, the appropriate procedure would have been a motion to quash. Had the president been required to proceed in state criminal court, again, I agree, a motion to quash would have been appropriate. But having been granted the right to come to federal court because of his unique status and having to then file a civil action, which he did, we then confront, you know, all the ordinary rules of civil procedure that apply across the board. And here, I think, again, to repeat maybe what I said earlier, I think the real problem was the district attorney decided to file what is a very intensely factual issue, seek to deal with it at the pleading stage, and I think likely to avoid the kind of motion to quash procedure that would have happened at summary judgment. We submitted a letter to the district court outlining what we thought the appropriate procedure was. It looked very much like a motion to quash procedure, perhaps almost identically. And we think it should have expeditiously moved to that stage, and I think everything would have followed in the ordinary course from there. Just to follow up on another question with respect to timing, you were able to file the brief in connection with this motion almost immediately after Judge Marrero issued his decision. And so it seems that both parties, frankly, are quite prepared to have a, for lack of a better term, hyper-expedited briefing schedule. Is that right or is that wrong? That is right, Your Honor. Throughout this case, we have always accepted and not resisted expedited review. It was at every stage. Of course, we don't think it's our place to dictate to the court or suggest how fast a case might move. This court moved slightly faster than the Supreme Court thought was needed. On Weymand in the congressional cases, at least in the D.C. Circuit, the court gave two weeks for a briefing and then replies, although that's obviously a slightly different posture. But I raise it only to suggest that something along those lines we would not object to so long as a stay was in place throughout that period. And indeed, there was an administrative stay in place throughout the entire briefing period in the prior appeal in this court on this case until the parties reached an agreement on the eve of argument to further extend it through Supreme Court review. So I guess that's a rather long answer to a short question, which is, yes, we are. We are prepared for expedited proceeding in the merit so long as there is the status quo is preserved during that period. Thank you. Thank you. Thank you. We will now hear from Mr. Oh, go ahead. If the schedule were 10 days, 10 days and three days, would that be a problem for you? No, Your Honor, it would not. We would ask, though, again, that the status quo be preserved and that in the event that we're hopeful that the appeal will be successful. But if not, this might be my last chance to ask before any order would issue that there would be some, again, opportunity to seek protection while the president seeks further review in the Supreme Court, if that were necessary. But with that small additional detail, we have no objection. Thank you, sir. Thank you. We're now here from your adversary. Thank you, Judge. May it please the court. I'm Kerry Dunn representing the office of the district attorney of New York County. Your honors, we submit there couldn't be a more particularly meticulous review than the district courts. One hundred and three page review of the president's 16 page complaint. The district court found that the president hadn't met his burden for any element of the stay likelihood of success, irreparable harm or the public interest. Unlikelihood of success. The two causes of action are based entirely on conclusory statements and implausible inferences, as the district court found. The most central example of that is the repeated assertion that our investigation is limited to hush money payments in 2016. That argument underpins both his claim of overbreath and the claim of bad faith. But no facts in the complaint support that inference. The president's complaint at every turn that we've not announced what the grand jury is looking at, as if that's itself bad faith. But, of course, what the grand jury is looking at is secret. We're not allowed to make that public, which is what has led to his speculation about the grand jury scope. But none of this speculation is plausible. And I'll give you two quick examples. First, he says that initially the Trump organization received a subpoena and it was largely about hush money payments. Based on that, he claims the entire investigation must be limited to hush money payments. Later, he says Mazars received a subpoena on a variety of other issues. And since those issues weren't limited to hush money payments, he says that second subpoena must by definition be overbroad. But to use the Supreme Court standard in Ashcroft v. Iqbal, the argument violates judicial experience and common sense. Why take the first subpoena as the best evidence of the investigation scope? Why not the second one? Why not both? The argument also misunderstands how a grand jury works. Of course, the focus can shift and expand over time. Another quick example, the complaint alleges that a New York Times article said early on that the investigation was looking at hush money payments. But the complaint fails to mention that the same article goes on to say that the full scope of the investigation is unclear. Again, he asks the court to rely on a newspaper article, but to ignore the part of it that contradicts his proposed inference. That doesn't meet the plausibility standard. Your two minutes have just about expired. Thank you, Your Honor. If I were to go on further, I would talk about irreparable harm. But I'm happy to take questions now. Judge Walker? Yeah, this is Judge Walker. Mr. Dunn, the problem I see is that there is a claim of overbreadth here, which you've acknowledged. And that you say that they haven't come close to establishing what is overbreadth. But how does one establish overbreadth? Overbreadth, apparently, according to the cases, is where the subpoena is not reasonably related to or not related to or can't be related to the subject matter of the investigation. So how do you measure overbreadth when you don't know the subject matter of the investigation? And as you say, the full scope is unclear. So how do you measure that? That's my first question. The second measure question I have is, and it's related, is shouldn't there be some sort of ability to measure overbreadth? More concretely than that just kind of general platitudes about a presumption of irregularity in a subpoena, where the president is involved. That's not asking for a special need or showing a special need. That's just asking for some way to measure, some metric to measure overbreadth. Thank you, Your Honor. If I could take your second point first. I beg to differ that the presumption of validity that has long been held to apply to a grand jury subpoena should be viewed as a platitude. I think it's, in fact, the principal answer to your first question. As the district court observed, I mean, obviously the law presumes that a grand jury is valid and issued within the scope of the grand jury's authority. That's the Virag B. Hines case from the Court of Appeals in New York. And what that means is that the presumption of validity can only be overcome by, quote, concrete evidence that the materials have no conceivable relevance to any legitimate object of investigation. That's the standard. That gets to my second point, though. Yes. How can you make that measure? It seems to me from what I've read from your position on this is that there is no way of really measuring overbreadth because you can't – it's breadth over what? And we don't know what the what is. Right, Your Honor. Therefore, how do you distinguish what you're asking for or a subpoena that is very broad and might engage in some fission? Well, I think the answer is, first of all, it's very difficult by design because of the nature of a grand jury investigation and the grand jury's need to take a full scope and full review of facts under the cloak of secrecy. On the other hand, there are cases, of course, where overbreadth has been found. And in those cases, there has been, in most cases, exogenous evidence available that established that there was overbreadth by way of bad faith. There have been cases that involve statements made by a district attorney or others that showed that there was no good faith basis and that kind of thing. But as the presumption requires, if indeed there is a challenge and the challenge does not include concrete evidence and information, it's not – the burden doesn't shift to the prosecutor. Here, we have – there's two things that I should add that the other remedy for when there is some notion or assertion factually of overbreadth that justifies further review, of course, is that in the motion to quash cases, what's available to a court is to request an in-camera submission, which can give the court comfort that indeed there's nothing awry going on. Here, not that I would suggest looking at it for purposes of our 12B6 motion, but there is the Shine Rock Declaration in the record below, which is – there's one in redacted form, which does amount to an in-camera submission. And secondly, we have tried to spell out consistent with grand jury secrecy all along, and I can represent to the court now that each of the category of documents that we've sought is directly relevant to a subject matter of our inquiry. And importantly, virtually all of those subject matters have been previously identified in public reports as examples of possible corporate wrongdoing. In view of that, I don't think there's any need for the court here or otherwise to credit a nonspecific and nonfactual content claim of overbreadth just because a subpoena is broad in scope. Well, it's broad in scope in terms of the categories of documents that you're asking for, but I can understand those categories completely if you're focusing on a particular practice or a particular transaction. What I can understand, however, is why – is how this reaches all 11 of the subpoenaed entities, whether or not they are even in this country. And that, it seems to me, is a broadening of even what the Congress had in mind. And that's what I – I just have trouble understanding. It has the feeling of overbreadth, but there's no way to measure it. That's the problem that I have. Well, Your Honor, with respect, this is – the breadth of the subpoena here in a financial investigation by our office is actually not unusual at all. And again, the public record reflects that each of the categories we're talking about has been publicly alleged to be a transaction that involves potential criminal wrongdoing by the organization at issue. The fact that we've concluded all – I understand. I understand that. That gets to the kinds of documents you're asking for, it seems to me. But what I'm concerned about – what I'm wondering about, anyway, I'm not terribly concerned about it, but what I'm wondering about is the nature – is the – are the entities that have been subpoenaed, which are covered by the subpoena.  There are 11 entities, plus their subsidiaries, plus their parents, plus their associations, plus joint ventures, and the like. So it is much broader than that. And, you know, it just seems to me that it's really very broad when you're asking for, you know, activities in Europe and Dubai and so forth. And here you are, a prosecutor in New York, in New York County specifically. Maybe you can help me on that. I'd like to, Your Honor. I mean, I think the simple answer is that, again, it's nothing unusual about our office or an office like ours seeking information, putting aside the entities, which we think all – may have relevant information, and we're entitled to explore that, the grand jury is. But the important thing is that there's nothing unusual about an office like ours asking for information about out-of-state or, indeed, foreign transactions that have elements or effects in Manhattan. That's our – you know, that's simple jurisdiction. And since, of course, New York City is the center of worldwide commerce, there's lots of international financial activity over which we have jurisdiction every day, and this is not unusual in a subpoena like ours. Even more so if, as here, the company at the center of all that international activity has its headquarters in Manhattan. That's why we have jurisdiction. And I submit, given the public reports, we would be remiss not to be exploring all these allegations that have been made. Thank you. You're welcome. Mr. Dunn, this is Judge Katzmann. I take it that were this panel to grant this day pending appeal, that you would be prepared for an expedited appeal, your adversary very helpfully agreed under certain circumstances to a schedule that would be 10-10-3. I take it that you would also be amenable to that were this panel to grant a stay pending appeal. We would not object to that, Your Honor. We would leave it to the court. Obviously, we have been extremely concerned about expedition at every turn, and that remains the case. So if a stay were to be granted here, I mean, we would be even happier with a shorter schedule, to be honest. And as my adversary indicated, we are expecting in any event, unless there is a reversal of the district court, that we would be headed to the Supreme Court, too. Therein, again, we would be asking for expedition, and again, arguing that, in fact, there's no need for a stay because of the lack of irreparable harm, including the point that was raised earlier, that there are remedies that could be imposed, and courts have done so numerous times to put the parties back to where they were if there has been a production of materials, especially to a secret grand jury, notwithstanding a later determination that the subpoena should be quashed. Judge Laue? So, Mr. Dunn, just as a follow-up to that point, Mr. Conteboy argued that you could not unring the bell, at least with respect to information and documents that are reviewed by the prosecutors themselves, in connection with the assessment of irreparable harm. What's your response to that? Your Honor, I think that argument just ignores the practical steps that courts do take quite frequently, and the case that I point to you in our brief is the Third Circuit case from 2006, in-ray grand jury investigation, but there are plenty of New York State cases as well, in fact, cited in the district court's opinion as well, that show how – I hate to use the analogy again, but the toothpaste can be put back into the tube sufficiently to protect people's rights. If a court later upheld the complaint, the remedies can include not just destruction or return of the documents, striking of testimony, but yes, courts have required the impaneling of a new grand jury so that the new grand jury is not tainted by any exposure to the earlier materials, and yes, there have been cases where the requirement was imposed that a new prosecution team be put in place that doesn't have any potential taint from exposure to the prior materials. I think these are all very hypothetical concerns, Your Honor, given the facts of this case, but the fact that someone has at one point looked at materials that later had to be returned doesn't mean that the case has to be dismissed. And in a situation like this, given the history here and the harm that we are experiencing every day by way of delay, suggests that we should be willing, I submit, to anticipate these kind of remedies and get the documents and get on with our business of investigating. And I have just one more follow-up question. So, obviously, we're in an unusual posture with respect to a grand jury subpoena, but Mr. Constable, we also argued forcefully that the district attorney's office has accepted this posture of a motion to dismiss rather than a motion to quash. And you heard my question expressing, I guess, some concern about the effect of this case on other cases in the ordinary course. Could you just elaborate on your views on that? Yes, Your Honor, and I agree with your – understand and agree with your concern. I think this probably is the first time that someone has sought to bring a motion to quash in the guise of a 12B6 – I'm sorry, in the guise of a 1983 civil action seeking discovery from the district attorney. And as the district court observed, I think it's fair to say in passing, motion to quash would be the more typical, was his word, and I'd say perhaps more appropriate proceeding. As to Your Honor's concern as to whether it could lead to a precedent-setting trend where people are bringing these civil actions in response to grand jury subpoenas, I do think that the fact that it's a precedent seeking to invoke 1983, which is obviously very unusual, probably limits the precedential value of this. But the bottom line is that although I think a motion to quash would have been more procedurally appropriate, you're correct that we are not seeking to have this court convert it to a motion to quash or otherwise impose a higher standard that would be associated with a motion to quash because we think that the President has plainly failed to meet the four corners of the complaint test under 12B6, and we think that the simple answer here is to dismiss on that basis. That's very helpful. Thank you. Thank you both for your arguments, and you can expect something from us by the end of the day. Thank you. Thank you, Your Honor. Thank you.